In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-3428

MATTHEW S. CARLSON,

*v.* *Petitioner-Appellee,*

CATHY JESS,

*Respondent-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 C 481—**Lynn Adelman,** *Judge.*

———————

ARGUED MARCH 31, 2008—DECIDED MAY 19, 2008

———————

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* After a one-day jury trial, Mat-
thew Carlson was convicted of first-degree sexual
assault of a child and sentenced to 55 years in a Wis-
consin state prison. He now seeks a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, arguing that the state trial
court's denial of his motion to substitute counsel and for
a continuance violated his Sixth Amendment right to
counsel of choice and his Fourteenth Amendment right
to due process. He also maintains that the state court of
appeals' decision affirming the trial court's judgment
was unreasonable. The district court (Judge Lynn Adel-

man) agreed with Carlson and granted his petition in a comprehensive opinion. *Carlson v. Jess*, 507 F. Supp. 2d 968 (E.D. Wis. 2007). The State now appeals.

Back in 1996, Carlson was convicted of one count of sexual assault of a boy under the age of 13. At that time, the complainant here, we'll call him "Gino," was 9 years old and a friend of Carlson's stepson. Upon hearing of the conviction, Gino's grandparents asked him whether Carlson had ever assaulted him. Gino denied any improper behavior on the part of Carlson.

Six years later, in 2002 when Gino was 15 years old, he alleged that Carlson sexually assaulted him in 1996 and 1998. Gino initially complained to the staff of Rawhide Boys Ranch,[1] where he then resided. Soon thereafter, the Ozaukee County[2] district attorney charged Carlson with several counts of sexually assaulting Gino. Carlson hired attorney Randall Kaiser to represent him. At Carlson's May 20, 2002, arraignment, the trial court set a trial date of August 27, 2002. The parties agreed that

---

[1] On its Web site, www.rawhide.org, Rawhide describes itself as "a faith-based, non-profit residential care center dedicated to changing the lives of troubled teen boys." Its mission is to "inspire and equip at-risk, teenage boys to become responsible young men through family-centered care, treatment, and education."

[2] Ozaukee County is located just north of Milwaukee County on the western shores of Lake Michigan. Ozaukee County is rather small, only some 86,000 residents, compared to Milwaukee County which checks in, according to a 2006 estimate, at 915,000. Also, according to U.S. Census Bureau statistics, Ozaukee County is fairly wealthy: its median household income is $69,174 as compared to Milwaukee County's $39,481.

the trial would take, at most, two days to complete. Carlson remained in jail from the time of his arrest until his eventual trial.

In the weeks leading up to the trial, Carlson requested two brief continuances, one for additional preparation time and one to permit Kaiser's co-counsel to assist him at trial. The trial judge denied both requests, citing his calendar and the fact that the complainant was a juvenile. In the meantime, Carlson lost confidence in Kaiser's ability to represent him. On August 17, ten days before the scheduled start of the trial, Carlson notified Kaiser that he had hired another attorney, Robin Shellow, to replace him. Two days later, Kaiser moved to withdraw as counsel. On August 23, Carlson, with Shellow's help, moved to substitute Shellow for Kaiser as his counsel, conditioned upon an adjournment so that Shellow could prepare for trial. In support of the motion, Ms. Shellow submitted a detailed explanation of the additional investigation she wanted to conduct before trial.

The trial judge, however, did not sit during the week of August 19 and thus did not promptly address Kaiser's motion to withdraw or Carlson's motion for substitution and a continuance. On August 26, the day before the trial was scheduled to begin, the judge returned to the bench and held a hearing on the motions. There, Kaiser stated:

> I am in a very tough position I think if I am not allowed to withdraw. As I said, our communication has completely broken down. We have differences of opinions, and I know they don't feel confident, he and his family. I think it's better for everyone if I withdraw.
>
> I don't feel that the state is prejudiced by allowing me to withdraw. It's my understanding that they

really only have one citizen witness. This is a case that allegedly occurred approximately six years ago and was not charged until April of this year. So I don't think Attorney Shellow or I—I don't want to speak for her, but I don't think we are requesting a long adjournment. This is the first request that Mr. Carlson has made for a new attorney.

Kaiser also explained that Carlson was not seeking to delay the proceedings unnecessarily and reminded the court that Carlson was and would remain in custody during a continuance. The prosecutor opposed Kaiser's request because Shellow "ha[d] already indicated in papers that she wouldn't be able to proceed tomorrow" and because the complainant was a child.

The trial judge conceded that "the defendant has a right to counsel," but stated:

I think here there are paramount issues. And the first issue is the orderly administration of this Court. I said last week or on the 14th that it would be months before this case got back on the trial calendar. And these late motions to withdraw, I am not inclined to grant it—in fact, I am not going to grant the motion to withdraw. This case is going to trial tomorrow. I don't see any reason why it can't go. This Court is prepared to try it.

I also am concerned that you have a young victim in this. Not as young as some the Court sees, but young. And I don't see anything in the motion papers that were filed by Attorney Shellow that is of a magnitude that causes the Court to hesitate and say this Court can't go to trial tomorrow. I am ordering it to go ahead.

Shellow then asked to be heard and stated that the case involved factual issues that Kaiser had not explored and constitutional issues that he had not researched. She explained that she wished to explore Gino's motives for making the allegation and to engage an expert regarding a number of questions, including questions raised by Gino's reporting of the assaults to Rawhide staff years after they allegedly occurred. Shellow stated that she also wished to examine possible improper police coaching and a *Miranda* issue. She also noted that Kaiser's failure to explore any of these matters raised issues of ineffective assistance of counsel.

The judge's only response was to ask Shellow if she was prepared to try the case tomorrow. When Shellow replied that she was not, the court stated:

> Then I am not granting the motion. This case is staying on the calendar. I understand the problems, but I find that a case that's been set 90 days out, and then to come in the day before and say I want to withdraw and I want it taken off the Court's calendar, is a serious problem for administration of this Court. And I realize there are issues. But I think Mr. Carlson can get a fair trial. His attorneys have been working on this. They have been in court numerous times. And I think there are other issues that have to be factored into the analysis, and I have done that, and I am denying the request.

The next day, before the trial commenced, Carlson himself asked to address the court. He stated:

> I have tried on numerous occasions to convey my concerns with Mr. Kaiser, to no avail. I have been met with argumentative comments, I have been met

with the impression to take a plea bargain which I've signed several papers stating I would not, and that seems to be our whole matters. . . .

. . . .

. . . I have not received one piece of paper concerning this case since I have been incarcerated. I have not one sheet of paper about this case to look back on when I am in jail. Also, one of [Kaiser's] associates, who I will not name, when I met the first time I could swear under oath I have smelled liquor on his breath. I am not—I am not gonna mention any names, I didn't want to risk a lawsuit. And also I have talked to Mr. Kaiser several times about different witnesses that obviously he doesn't feel I need, and I have mentioned to him and so have my parents and my wife about possibly different people we could bring, prior to May 23rd or whatever that was, and I still have not heard nothing about that either.

The judge acknowledged that "there are situations where release of counsel is warranted, when there's an ethical dilemma, when there is a situation where the relationship has broken down to the point where there's no communication," but he said Carlson and Kaiser's relationship was only suffering because of "differing views of how the case is approached," and "strategic decision[s]." The judge continued:

Against [Carlson's request to substitute counsel and for a continuance] the Court has the responsibility, some countervailing responsibilities. One is to administration of this Court. . . . I have the victim rights obligations that I have to consider, I have to consider

a fair trial for you, and I have to consider the adminis-
tration of this Court's calendar. . . . I don't have
another date that could fit a trial like this in until
probably after the beginning of the year. . . . I also
have a young victim, not the youngest as I acknowl-
edged yesterday, who has to have this hanging out
over their head. And on balance I denied the request.
And I am comfortable with the request, I'm comfort-
able that Mr. Kaiser can represent you in a competent
manner. 90 days ago this trial date was set, and the
desire to have a different lawyer or these other issues
should have been brought up much earlier in the
proceedings.

Kaiser then addressed the judge one last time, imploring
him to allow the substitution:

[W]e've had a breakdown in communication, and
that is one of the factors I think to allow withdrawal
of an attorney. I understand it's sort of the last
minute, but he hired new counsel and I'm still of the
opinion that because of the total breakdown in com-
munication that we've had, that—and there is no
taxpayer expense, this is only a one-day trial, I
don't, considering the long time it took the alleged
victim to report this case, I don't think a short ad-
journment would prejudice anyone but the Court. So
I'm renewing my objection and just stating that
we've had a breakdown in communication.

The court denied the motion and trial proceeded as
scheduled. Gino testified that Carlson sexually assaulted
him on several occasions in 1996 and 1998 when he spent
the night with Carlson's stepson and once when he rode
in a car with Carlson. A detective testified about Gino's
initial statement accusing Carlson of sexual assault. Gino's

mother testified that Gino spent the night with Carlson's stepson on several occasions and rode in a car with him at least once. She also testified that her son had never indicated any animosity toward Carlson or concerns about visiting his stepson prior to reporting the sexual assaults in 2002. Carlson testified, denying Gino's charges. Carlson's wife testified that they lived in a small apartment and that she was home during all of her son's sleepovers and thus would have seen or heard any interaction between Carlson and Gino. The jury convicted Carlson of five counts of first-degree sexual assault of a child and, as we said, he was sentenced to 55 years in prison.

Carlson appealed to the state court of appeals, arguing among other things that the trial judge's refusal to grant his motion for substitution of counsel and a continuance deprived him of his right to counsel of choice and his right to due process of law. The court of appeals, in a per curiam decision that noted "This opinion will not be published," affirmed, and the state supreme court subsequently declined to review the case.

Having exhausted his state court remedies, Carlson petitioned the federal district court for habeas relief, arguing that the state court's decision was an unreasonable determination of the facts and contrary to, or an unreasonable application of, clearly established federal law. The district court first determined that the record contained no evidence supporting the state trial judge's finding that communication between Carlson and Kaiser had not totally broken down. Accordingly, the district court found that because the finding was unreasonable, the state court of appeals' decision to accept and rely on it was also unreasonable. With this determination, the

district court then examined the merits of Carlson's constitutional claim and concluded that the trial court's denial of Carlson's motion for substitution of counsel and a continuance was arbitrary and had an adverse effect on the presentation of his case. The district court then granted Carlson's petition for relief.[3]

We review the district court's findings of fact for clear error and its legal conclusions, as well as mixed questions of law and fact, *de novo*. *Harding v. Walls*, 300 F.3d 824, 827 (7th Cir. 2002). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may issue a writ of habeas corpus only if the decision of the last state court to examine the merits of the petitioner's claim (here, the court of appeals) (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

The first issue is whether the district court correctly determined that the state court of appeals affirmed the trial court's denial of Carlson's motion for substitution and a continuance based on an unreasonable factual determination—namely, that communication between Carlson and Kaiser had not completely broken down. A state court's factual findings are presumptively correct absent rebuttal by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Nevertheless, "[a] federal court can

---

[3] The district court did not address Carlson's argument that the court of appeals' decision was contrary to, or an unreasonable application of, clearly established federal law.

disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The record reveals absolutely no support for the state trial court's determination that Carlson's motion for substitution was based on "differing views of how the case is approached" and "strategic decision[s]." Rather, the record is littered with statements by Kaiser and Carlson himself that communications had completely broken down. On August 26, Kaiser stated that communication "has completely broken down." On August 27, he repeated this statement *twice*, telling the court that "we've had a breakdown of communication" and that there had been a "total breakdown in communication." That same day, Carlson himself told that court that he had "tried on numerous occasions to convey [his] concerns with Mr. Kaiser, to no avail" and that he "still ha[d] not heard nothing" about his requests that Kaiser interview certain witnesses. Based on these statements, the trial judge should have at least probed the matter further by asking Carlson and Kaiser some follow-up questions. Instead, however, the judge simply made a factual finding that "the relationship has [not] broken down to the point where there's no communication." The trial court's statement that Kaiser had "discussed witnesses" with Carlson is belied by Carlson's statement that he had not yet heard anything from Kaiser on that issue. With nothing in the record to back it up, the trial judge's finding was clearly unreasonable.

The court of appeals also neglected to consider the evidence supporting Carlson's motion. In its decision, it merely paraphrased the trial judge's findings and stated

that it was "not convinced that the trial court erred when it concluded that the asserted conflict between counsel and Carlson was not so great that it resulted in a total lack of communication." Thus, the district court properly found that both the trial court's finding and the court of appeals' acceptance and reliance on that finding was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004) ("In passing section 2254(d)(2), Congress has reminded us that we may no more uphold [an unreasonable] factual determination than we may set aside reasonable state-court fact-finding.").

The second issue is whether the district court correctly determined that the trial court's denial of his motion for substitution and a continuance violated Carlson's constitutional rights. Because the trial court based its decision on an unreasonable factual determination, the substantive merits of Carlson's claim are analyzed under the pre-AEDPA standard—that is, *de novo*—because there is no state court analysis to apply AEDPA standards to. *Conner v. McBride*, 375 F.3d 643, 655 n.5 (7th Cir. 2004). The pre-AEDPA standard directs us to "dispose of the matter as law and justice require." 28 U.S.C. § 2243.

Carlson maintains that the trial court's decision violated his Sixth Amendment right to counsel of choice and his Fourteenth Amendment right to due process. The Sixth Amendment secures the right to the assistance of counsel. It also includes the right to select, and be represented by, one's preferred attorney; thus, trial courts must recognize a presumption in favor of a defendant's counsel of choice. *Wheat v. United States*, 486 U.S. 153, 164 (1988). Accordingly, the Sixth Amendment bars a court from denying a defendant the right to retain counsel of

his choice arbitrarily or unreasonably. *Ford v. Israel*, 701 F.2d 689, 692 (7th Cir. 1983). The Fourteenth Amendment's Due Process Clause also bars a court from denying a defendant's motion for a continuance arbitrarily or unreasonably. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Thus, motions for substitution of retained counsel and for a continuance can implicate both the Sixth Amendment right to counsel of choice and the Fourteenth Amendment right to due process of law. *See Morris v. Slappy*, 461 U.S. 1, 11 (1983).

The right to counsel of choice, however, is qualified in several respects. One qualification is that an indigent defendant generally has no right to have his counsel of choice appointed. *Wheat*, 486 U.S. at 159. Thus, when a trial court refuses to appoint new counsel, the defendant can only show a denial of a constitutional right if he can establish that his counsel was ultimately ineffective—that is, he must show prejudice as required by *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Harris*, 394 F.3d 543, 554 (7th Cir. 2005); *United States v. Zillges*, 978 F.2d 369, 372 (7th Cir. 1992). The Supreme Court recently resolved a circuit split and held that a defendant claiming a denial of the right to counsel of choice does not have to show *Strickland* prejudice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 2562 (2006). At the time Carlson's conviction became final, our governing case, *Rodriguez v. Chandler*, 382 F.3d 670 (7th Cir. 2004), stated a similar rule. However, *Rodriguez* did require a defendant claiming a denial of the right to counsel of choice to establish that the denial had an "adverse effect" on the presentation of his case. *Id.* at 675. Thus, to resolve the merits of Carlson's constitutional claim, we must answer two questions: (1) was the

trial court's denial of his motion for substitution of counsel and a continuance arbitrary and if so, (2) did the denial have an adverse effect on the presentation of his case?

First, we examine whether the trial court's denial of Carlson's motion for substitution of counsel and a continuance was arbitrary. Because trial courts have broad discretion on matters of continuances, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris*, 461 U.S. at 11-12 (quoting *Ungar*, 376 U.S. at 589). The State argues that the trial court's exercise of discretion was not arbitrary because it listened to the arguments and concluded that (1) the timing of the request for adjournment, (2) the young age of the victim, and (3) the satisfactory relationship between Kaiser and Carlson all necessitated denying Carlson's request for an adjournment to substitute counsel. We have already determined that the trial court's conclusion that the relationship between Kaiser and Carlson was satisfactory was unreasonable.[4] The other two arguments fail as well.

The State's argument that Carlson was not entitled to a continuance because of the timing of his request is far from compelling. Courts have denied motions for con-

---

[4] In its brief, the government states that "there is no reason to think that the [trial] court would not have granted the motion to substitute, had Shellow been prepared to try the case on the scheduled date." Rather than justifying the trial court's decision, this statement actually reveals that the court's primary consideration was its calendar, not the relationship between Carlson and his counsel or the age of the complainant.

tinuances based on administrative concerns in a number of fact situations. *See Carlson*, 507 F. Supp. 2d at 982 (collecting cases). Here, however, there were few administrative problems to consider. This was a relatively simple case, and the parties predicted that the trial would take a little over a day. The State had only three witnesses, Gino, his mother, and a police officer, who could have easily appeared at a later date. Carlson filed his motion a week before trial; through no fault of his own, the court did not hear it until the day before the trial was set to start. Nevertheless, even at that point, the witnesses and jurors had not yet assembled. The court repeatedly cited its calendar as a reason for denial, saying that "it would be months before this case got back on the trial calendar." But, trial dates open up all the time—for instance, when a defendant decides to plead guilty.[5] Even the inconvenience of pushing the trial back a month or so would be easily outweighed by Carlson's interest in having his counsel of choice properly prepared to defend him against such serious charges.

Furthermore, Carlson was obviously not seeking to delay the trial unnecessarily. As Ms. Shellow pointed out, Carlson had remained in jail from the time of his arrest;

---

[5] We also note that Ozaukee County, perhaps because it's fairly affluent, does not appear to be a hotbed of criminal activity. According to the Wisconsin courts Web site, www.wicourts.gov, the judges in Ozaukee conducted a total of only 22 jury trials in all classes of criminal cases—felony, misdemeanor, and criminal traffic—in 2007. That's not a very heavy diet of cases compared to its neighboring county to the south (Milwaukee) where 389 such jury trials were conducted in 2007.

thus, he had nothing to gain by needlessly delaying the trial. He had never requested to substitute counsel previously and had no history of "gaming" the system. The trial judge repeatedly referred to Carlson's motion as "late," but considering that the charges against him had been pending such a relatively short time and that he filed his motion to substitute immediately after he retained new counsel, the timing of his motion was certainly understandable. Finally, Carlson was not asking for a long continuance. Notably, we do not know how long Ms. Shellow would have needed to prepare because the trial judge never asked her. Apparently, *any* delay would have been unacceptable to the trial judge. That sort of rigidity can only be characterized as arbitrary. *See*, *e.g.*, *Linton v. Perini*, 656 F.2d 207, 212 (6th Cir. 1981) (holding that, in a case involving serious charges, a trial judge acted arbitrarily in denying a continuance where there was no evidence of a scheme to delay the trial, no showing of inconvenience to the witnesses, opposing counsel, or the court, and the length of the requested delay was not unreasonable).

The State's argument that Carlson was not entitled to a continuance because of the young age of the victim, although facially legitimate, is unpersuasive on the record in this case. Undoubtedly, a trial court may reasonably consider the effect of a continuance on a complainant. Here, however, the court never actually considered whether a continuance would affect Gino. Despite the court's repeated statements to the contrary, the record indicates that a short delay would not have been detrimental to him. His initial complaint came some four to six *years* after the alleged assaults; thus, he would not appear to be at risk for forgetting relevant information a

few *months* later. Moreover, Gino was a teenager, not a young child, and there was no evidence that a brief delay would have caused him emotional or psychological harm.

Against these ultimately unconvincing reasons to deny Carlson a continuance were several compelling reasons he proffered in support of his motion for a substitution. Specifically, Carlson stated that (1) communication between Kaiser and himself had totally broken down; (2) Kaiser had inadequately investigated the case; and (3) he disagreed with Kaiser's overall approach to defending him. As we previously explained, these reasons were facially valid; thus, the trial court needed to explore them and, because Carlson also requested a continuance, balance them against the reasons for not granting Carlson's motion. The trial judge, however, made no effort to do so.

In casting Carlson's arguments aside, the judge may have been attempting to follow precedent on *appointed* counsel and the right to effective assistance of counsel, which sets higher standards for relief than the right to be represented by *retained* counsel of choice. For instance, a total breakdown in communication justifies the appointment of new counsel for an indigent defendant. *Harris*, 394 F.3d at 552. However, even if a breakdown in communication is not so severe as to implicate the right to counsel, it may still provide a reasonable justification for a substitution of retained counsel and a continuance. And, while an attorney's strategic decisions are not deficient performance under the test for ineffective assistance of counsel, *Strickland*, 466 U.S. 668, 688-89 (1984), a significant dispute about strategy may implicate a defendant's right to counsel of choice. Thus, when Carlson presented

his arguments, the trial judge erred in dismissing them as irrelevant to his constitutional rights.

In sum, the trial judge ignored the presumption in favor of Carlson's counsel of choice and insisted upon expeditiousness for its own sake. The judge made no effort to ascertain the facts and follow up on Carlson's reasonable justifications for seeking a substitution. The reasons the judge did cite for denying a continuance were weak, and he made no attempt to balance them against the effect of Kaiser's possible failings and Carlson's interest in having his attorney of choice defend him against serious charges. Thus, the trial court's denial of Carlson's motion for substitution and a continuance was arbitrary and in violation of the Sixth and Fourteenth Amendments.

Finally, we analyze whether the denial of Carlson's right to retain his chosen counsel had an "adverse effect" on the presentation of his case. Under *Rodriguez*, such adverse effect

> means an identifiable difference in the quality of representation between the disqualified counsel and the attorney who represents the defendant at trial. The difference does not have to be great enough to undermine confidence in the outcome—that is the standard under *Strickland*—but it must be enough to show that the defendant's representation suffered a setback from the disqualification.

382 F.3d at 675 (internal citations omitted). *Rodriguez* went on to say that adverse effect might be shown if, for example, "counsel failed to pursue a reasonable alternative defense strategy." *Id.*

   Our case easily meets this standard because Kaiser failed to pursue the sensible defense strategy advocated by Shellow. In the motion for substitution and in her statement to the court, Shellow explained that she wished to explore Gino's motives for making the allegation. She planned to engage an expert (whom she identified by name) regarding a number of questions, including issues raised by Gino's reporting of the assaults to Rawhide staff four to six years after they allegedly occurred. Shellow also wanted to present evidence that Gino was aware that Carlson had previously been convicted of child sexual abuse (and thus knew that a similar allegation against him would be taken seriously) and that Gino had previously denied any sexual contact with Carlson. This strategy would have forced Carlson to divulge the nature of his prior conviction—which is why Kaiser did not want to pursue it—but it also would have elicited Gino's prior inconsistent statement and undermined his credibility. Because this was a reasonable alternative defense, the trial court's denial of Carlson's right to retain his chosen counsel had an adverse effect on the presentation of his defense. For these reasons, Carlson is entitled to his release from custody unless the State gives him a new trial with 180 days.

   For these reasons, the judgment of the district court granting petitioner's application for a writ of habeas corpus is AFFIRMED.