In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 06-3965

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BENJAMIN C. PRICE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:04-CR-81—**Philip P. Simon**, *Judge.*

_____

ARGUED NOVEMBER 1, 2007—DECIDED MARCH 27, 2008

_____

Before POSNER, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.*  When Officer Terry Smith of the Gary, Indiana, police department responded to a call on June 28, 2003, about fires that people were setting in alleys located in a high-crime area, he stopped to question Veronica Sanchez, whose car was parked nearby. As Officer Smith spoke with Sanchez, Benjamin Price strolled past him, said nothing, and sat down in the passenger side of Sanchez's car. It was not long before Smith and another officer discovered a gun in the car, near Price's feet. In due course, Price was indicted on charges of being a felon in possession of a firearm, in violation of 18 U.S.C.

§§ 922(g) and 924(e)(1). After a number of false starts, which we describe below, he was tried, convicted by a jury, and sentenced to 250 months in prison. Appointed counsel on appeal have raised a number of challenges both to his conviction and to his sentence. While we appreciate their efforts, we find no reversible error and thus we affirm.

**I**

Price's encounter with Officer Smith and his colleagues was far from his first brush with the law. By 2003, his rap sheet included the following felony convictions: Burglary, Cook County (Illinois) 1986; Burglary, Cook County 1986; Criminal recklessness, Lake County 1990; Possession of cocaine, Lake County 1990; Possession of a handgun, Lake County 1993; Possession of heroin, Lake County 1994; Criminal recklessness while armed, Lake County 1996; and Possession with intent to deliver a controlled substance, Cook County 1997. In addition to these convictions, he had some 20 additional arrests from 1981 through 2003, according to the presentence report. The fact that three of these prior offenses involved controlled substances accounts for the charge under 18 U.S.C. § 924(e)(1), which enhances penalties for such recidivists.

The primary facts that are pertinent to Price's appeal are those that relate to his motion to suppress. According to the police officers, after Price got into Sanchez's car, Officer Justin Illyes approached and asked Price to get out. As Price was doing so, Officer Illyes noticed a white towel with the butt of a gun protruding on the floorboard by the passenger seat. Officers Smith and Illyes

handcuffed both Sanchez and Price, who were arguing over whose gun it was. Officer Illyes testified that at some point during this exchange, Price admitted that the gun was his, that he was a convicted felon, and that he was not allowed to possess a gun. Officer Illyes then took Price into custody, while Smith gave Sanchez a ticket for obstructing the alley. Either Illyes or Smith (the testimony was unclear) took Price into the police station.

Sanchez disputed many of these facts, including the race and sex of the police officer who initially approached her, the words that the officer spoke to her, when the gun was discovered, and when Price first arrived. Price denied that he ever admitted that the gun was his. Instead, he testified that he arrived on the scene only after the gun had been seized. In any event, after Price's arrest, the Gary Police released him from custody, and he went to Florida. After the federal charges were filed against him, he was arrested in that state, and two federal agents spoke with him. During that conversation, he admitted again that he had acknowledged that the gun belonged to him.

The district court held a suppression hearing on April 22, 2005, which resulted in a written order issued on April 29, 2005, denying the motion to suppress. Much later, and after several intervening procedural steps (including the start of a jury trial, a resulting mistrial, and a flurry of motions from both sides), the district court decided in March of 2006 to reopen the suppression hearing to give Price the opportunity to present additional testimony. At the reopened hearing, which took place on April 5, 2006, Price questioned Foster Ward, a member of the Gary Police Department, about his acquaintance with Sanchez. Ward testified that he did not know her. At the conclusion

of the hearing, the court stood by its initial decision to deny the motion to suppress, explaining in essence that it found the testimony of the officers to be more credible than the account that Price and Sanchez offered.

A week after the hearing, the government filed a motion *in limine* seeking to bar any evidence that Ward actually did know Sanchez and had been in a sexual relationship with her, and that he had told Sanchez that he intended to lie under oath and claim that he did not know her. Price filed a motion for a continuance, hoping to explore this perjury, but the district court denied the motion, finding that this was a peripheral matter that did not justify further delay of the trial. Later, Price subpoenaed Ward to appear at trial, but Ward failed to show up. In Ward's absence, the district court allowed Ward's testimony to be read into the record. Price also wanted to call Detective Keith Richardson at the suppression hearing, because he believed that Richardson could offer exculpatory evidence. The court refused to call him at that time, but it ruled that Price was free to call Richardson at the trial. When the time came, however, the court changed its mind and barred Richardson from testifying.

The other part of the story on which the appeal turns concerns Price's zig-zags between accepting the representation of a series of lawyers and proceeding *pro se*. Immediately after Price was indicted, Public Defender John Martin entered an appearance for him on October 25, 2004. A short time later, Price moved to represent himself with standby counsel. Magistrate Judge Rodovich carefully warned Price of the pitfalls of that course of action, but Price persisted and the judge granted the motion. Less than a month later, on December 13, 2004, Price moved to substitute a new attorney and to withdraw his request

to proceed *pro se*. The court acquiesced, and on January 7, 2005, it appointed Attorney Arlington J. Foley to represent Price. Foley worked diligently for several months, filing motions on Price's behalf, but Price wrote a number of letters to the court expressing his dissatisfaction with Foley. Price even went so far as to forward a copy of one of his letters to the Indiana Disciplinary Committee; at that point, the district court intervened and held a hearing on April 5, 2005, on the topic of Foley's representation. Everyone agreed that Foley would stick with the case, but on the first day of the initial trial, May 2, 2005, Price complained repeatedly about Foley. After the jury was selected and sworn in, Price renewed his complaints. The court finally offered Price the options of proceeding in the current trial with Foley, proceeding *pro se* with Foley as standby counsel, or accepting a mistrial and securing new counsel. After an overnight recess at the government's request, Price expressly consented to the mistrial. The court granted the mistrial on two grounds: Price's consent and its finding that there was a manifest necessity for a mistrial because of Price's lack of participation in the jury selection process. At that point, the court appointed Charles Stewart to represent Price.

Only three weeks later, on May 25, 2005, Price announced again that he wished to proceed *pro se*. The court agreed and designated Stewart as standby counsel, over Price's objection. It refused at that point to recruit yet a fourth lawyer. From May 31, 2005, until the second trial was over, Price peppered this court with interlocutory appeals, six by our count. Eventually, we entered an order sanctioning him $500 for his frivolous filings. Price was still appearing *pro se* when his second trial began, but on Day 2, Stewart took over and completed the trial. After the

jury returned a guilty verdict, Stewart moved to with-draw as counsel. The court granted that motion and appointed Kevin Milner to handle Price's sentencing. Largely because of his lengthy criminal record, Price received a sentence of 250 months, a point in the lower third of the applicable range of 235 to 293 months. Milner filed a Notice of Appeal on Price's behalf, but he then asked this court to relieve him of his responsibility for the case. We granted that motion on December 12, 2006, and appointed Attorney Nancy Riley to represent Price on appeal; she has done so conscientiously.

## II

Price raises four challenges to his conviction, one to his sentence, and a general complaint that the cumulative effect of the alleged errors rendered the proceeding fundamentally unfair. Briefly, with respect to the conviction he claims that his double jeopardy rights were violated when the court granted the mistrial and proceeded with the second trial; that the court erred when it refused to allow him time to investigate Officer Ward's perjury; that the court erred when it barred Detective Richardson from testifying at trial; and finally, that the government failed to disclose potentially exculpatory material, in violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Even if none of these alone warrants reversal, he continues, cumulatively they add up to a constitutionally deficient proceeding. With respect to his sentence, Price argues only that the district court's choice was unreasonable, because (in his view) the court gave inadequate weight to significant mitigating factors that the PSR had identified.

A

1. Double Jeopardy

"The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982) (citing *United States v. Dinitz*, 424 U.S. 600, 606 (1976)). This protection does not arise until jeopardy attaches, which generally occurs when the jury is selected and sworn. See *Illinois v. Somerville*, 410 U.S. 458, 467 (1973). As the *Somerville* Court pointed out, however, "the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial." *Id.* In *Dinitz*, the Court held that there was no double jeopardy violation when a defendant was retried after his original trial ended in a mistrial at his own request. The outcome might have been different, the Court noted, if there had been evidence of governmental actions intended to provoke a mistrial or other evidence of bad faith on the part of the prosecutor. 424 U.S. at 611. But, as this court later noted in *United States v. Jozwiak*, "[a] right to obtain implies a right to relinquish," and a defendant's free choice to decide not to proceed with the first jury does not deprive him or her of any constitutional entitlement. 954 F.2d 458, 459 (7th Cir. 1992).

In *Kennedy*, the Supreme Court explained that

> [w]here the [first] trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard first enunciated in Justice Story's opinion for the Court in *United States v. Perez*, [22 U.S. (9 Wheat.) 579, 580 (1824)]. . . .

> But in the case of a mistrial declared at the behest of the defendant, quite different principles come into

> play. Here the defendant himself has elected to terminate the proceedings against him, and the "manifest necessity" standard has no place in the application of the Double Jeopardy Clause.

456 U.S. at 672. In the latter situation, the Court held in *Kennedy*, "the circumstances under which . . . a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for mistrial was intended to provoke the defendant into moving for a mistrial." *Id.* at 679.

Although the district court in Price's case found both that Price had consented to the mistrial and that manifest necessity supported the order of mistrial, we see no need to address the second of those grounds. Recognizing the legal standards we have just described, Price argues that the district court provoked him into moving for a mistrial, and thus that we should not treat this as a mistrial granted at his behest. In order to prevail on this point, Price would have to show that there was "governmental or judicial conduct intended to goad the defendant into assenting" to the mistrial. *United States v. Combs*, 222 F.3d 353, 359 (7th Cir. 2000). This record reveals nothing of the sort. To the contrary, it depicts a judge who patiently worked with Price to assure that he was represented by counsel that was satisfactory to him (when that was what he wanted) and that he could exercise his right to proceed *pro se* (when that was what he wanted). The judge's evidentiary rulings and decisions relating to the motion to suppress may have frustrated Price, but that alone cannot show that the judge was trying to goad him into seeking a mistrial. Otherwise this standard would have no meaning at all, as we can presume that

every defendant dislikes rulings that go against him. Indeed, as we explain below, we see no error in the judge's rulings; this conclusion forecloses entirely the possibility that the judge adopted them solely in order to goad Price into relinquishing his first jury.

We note for the sake of completeness that the errors that supposedly motivated the court to incite Price to move for a mistrial were (1) its refusal to appoint a third new attorney for Price and (2) its handling of an exchange with potential Juror McDade during *voir dire*, during which there was an indirect reference to Price's being in custody. The court acted well within its discretion with respect to Price's many requests for appointment of counsel. In the exchange with McDade, who had indicated that he was employed with "the Department of Justice at the federal prison in Chicago," the court interrupted him just after he said, "I just want to go ahead and I say that I do—well, I have seen the—." At that point, at a bench conference, the court told counsel that it "wanted to cut [McDade] off before the other jurors found out exactly what the MCC is, so that they don't know that he's in custody." Defense counsel moved then for a mistrial, but the court denied the motion and dismissed McDade. This strikes us as a perfectly reasonable way to handle the situation, and we are satisfied that the court intervened before any irreparable harm had occurred.

### 2.  Investigation of Officer Ward

On May 9, 2006, Price moved *pro se* for a continuance so that his hired investigator could explore the fact that Officer Ward had misrepresented the extent of his ac-

quaintance with Veronica Sanchez during the reopened suppression hearing. In its written order denying this motion, the court reviewed the background of the relationship between Sanchez and Ward:

> In sum, Price and Sanchez were present in an alley in Gary, Indiana in July 2003 when police seized a gun from the car Sanchez was driving. Price, a convicted felon, is charged with possessing the gun. According to the government, Ward was the last of multiple police officers to arrive at the scene. He was not the officer who initially stopped Sanchez; he was not the officer who arrested Price; he was not the officer who seized the firearm at issue. Ward has testified that he did not even exit his vehicle because, by the time he pulled into the alley, another officer had Price in handcuffs and was driving him away from the scene.
>
> After Price's arrest, Ward pursued Sanchez socially. He occasionally would run into Sanchez around Gary and would talk with her when he did. Eventually, sometime in 2005, Ward and Sanchez maintained a sexual relationship for a brief period of time while Sanchez was cooperating with the government in this case. Nonetheless, on April 5, 2006, Ward testified at a suppression hearing that he does not remember the name of the female with Price on the night in question, that he does not remember Veronica Sanchez, and that the name Veronica Sanchez does not "ring a bell."

After the suppression hearing, as we noted above, the government filed a motion *in limine* on April 13, 2006, to exclude any evidence or argument about Ward's relationship with Sanchez. In that motion, the government re-

vealed how it had learned about the relationship. It also disclosed that Ward had admitted that he had spoken to Sanchez shortly before the renewed suppression hearing, had instructed her to deny any relationship with him, and had promised that he would do the same.

In denying Price's motion for a continuance, the court took a number of factors into account. First, it pointed out that Price had received approval for an investigator on April 11, and that he had known about Ward and his testimony since April 5. At the time the government revealed Ward's dissembling, 32 days remained before the trial was due to start. Although the investigator advised Price that this was not long enough to look into the issues raised by Ward's admitted relationship with Sanchez, Price never said what work the investigator had done or what else needed to be done. Second, the court found that Price was not likely to suffer any prejudice from the denial of the continuance. He already knew about the relationship and Ward's perjury. Price speculated that Ward's behavior might somehow have infected the other police officers who arrested Price and seized the firearm, but the court found that Price was free to explore that theory at trial when he cross-examined Sanchez and the officers themselves. Third, the court found that the case was not complex. Fourth, Price was not claiming that the government had delayed in producing this information. Fifth, Price had not shown that the continuance would help in any event, given the speculative nature of his theory of prejudice. Finally, the court concluded that Price's case had already consumed significant judicial resources and that there was no reason to stretch it out further.

We have little to add to the district court's reasoning. The decision whether to grant or deny a continuance is one that lies within the district court's discretion. We would reverse only if there were an abuse of that discretion and a showing of actual prejudice. See *United States v. Miller,* 327 F.3d 598, 601 (7th Cir. 2003). Of all the points the court cited, the one that most strongly supports its decision in our view is the speculative value further evidence would have had. While Ward's behavior was not worthy of a sworn police officer, the judge was entitled to conclude that the benefit of delaying the trial for a detour into Ward's sexual relationship with Sanchez was not worth the cost.

### 3. Richardson Testimony

Price wanted to introduce testimony from Detective Keith Richardson at the trial in order to show the "highly irregular and entirely incompetent investigation performed by the Gary Police Department, upon which the Government's case rested." Here again, our review is only for abuse of discretion. See *United States v. Hernandez,* 330 F.3d 964, 969 (7th Cir. 2003) (citing *United States v. Hughes,* 970 F.2d 227, 232 (7th Cir. 1992)). Richardson was not on the scene during Price's arrest and was not involved in the recovery of any evidence, which is enough to support the court's decision to bar his testimony at the suppression hearing. It is true that at the suppression hearing the court suggested that Price would be able to call Richardson at trial, but Price misinterprets this statement. It reflected only the fact that a broader range of evidence would be admissible at trial. The court never promised that it would refrain from evaluating the admissibility of evidence at the trial in light of the record as

it was developing. And at trial, the court did not sum-
marily reject Richardson's testimony. It allowed Price
and his counsel to make a proffer, outside the hearing of
the jury, about what Richardson would say and why it
was relevant. Only after hearing them out did the court
decide that the testimony was wholly irrelevant and
rule that Richardson could not testify. Our own review
of the proffer convinces us that this ruling was well
within the court's discretion.

4. *Brady* Violation

In this part of the appeal, Price argues that the govern-
ment's failure to disclose the identities of certain white,
female police officers in the Gary Police Department
violated his rights under *Brady.* The names of these officers,
he claims, were critical to his efforts to corroborate
Sanchez's testimony that a white female officer had been
the first one to approach her, rather than Officer Smith,
who is male and African-American. Price did not raise
this issue before the trial court, and so (as he concedes) our
review is for plain error only. See *United States v.
Dominguez Benitez,* 542 U.S. 74, 81-82 (2004); *United States
v. Olano,* 507 U.S. 725, 732-35 (1993).

The government argues that there was no error at all,
plain or otherwise. In order to show a *Brady* violation, the
defendant must demonstrate prejudice (among other
things). Price cannot do so. He subpoenaed three of the
white female officers, and he was able to speak with at
least one of them. She had no recollection of the incident.
It is unclear whether the other two responded to the
subpoenas, but it is raw speculation to suppose that
either would have had anything to add, for neither of

their names appears on the dispatch report listing the officers in the area at the time of Price's arrest. Finally, Price never asked for a continuance to pursue this evidence, and any claim that such a request would have been futile is unpersuasive in light of the fact that three of Price's four requests for continuances had been granted. There was no error, plain or otherwise, in the court's ruling.

5.  Cumulative Error

Even if none of the individual errors in a case warrants reversal standing alone, it sometimes happens that the cumulative effect of a number of errors is an irreparably flawed trial. *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). Stepping back from the trees and looking at the forest, Price claims that his defense centered on discrediting the investigation conducted by the Gary Police, and that the court's rulings crippled this effort. When we are conducting an analysis of the effect of individual actions on the whole, however, we must look at the entire record. Price's argument is doomed, both because we have not found error in the underlying actions about which he is complaining, and because the jury was entitled to believe the considerable evidence against him (including the admissions reported by both the Gary police officers and the federal agents).

B

Finally, we turn to Price's complaint that his sentence was unreasonably long. He asserts that the district court erred by focusing exclusively on his criminal history,

instead of recognizing that a lighter sentence was appropriate given his history of psychiatric problems and substance abuse.

The district court noted that it had received and studied the PSR, along with Price's objections and the government's response. Taking into account the adjustments for Price's obstruction of justice and armed career criminal status, the court then noted that the guidelines range was 235 to 293 months. (At that point, Price interrupted the court mid-sentence to proclaim "You f**ked me." This was before he knew what the judge was going to do with that range, and before either he or his attorney offered any reasons to mitigate the sentence. The district judge, it appears, ignored the outburst.) Moving on, Attorney Milner (by then representing Price as his fourth appointed attorney in this case) stressed the advisory nature of the guidelines and urged the court to be lenient because Price, despite his lengthy criminal record, was "not a violent man by nature," was bright, and was trying to better himself. Price spoke also, but he dwelt on how unfairly he was being treated. Neither one of them said anything about psychiatric problems or substance abuse. The government urged a sentence at the top of the range.

The court then acknowledged the advisory nature of the guidelines and its duty to tailor the sentence in light of the factors set out in 18 U.S.C. § 3553(a). It noted, on the one hand, that Price was a bright man but, on the other, that he was "working on [his] 10th criminal conviction" and that the PSR described "a virtual revolving door of the criminal justice system." Finding that Price had shown a persistent unwillingness to conform his conduct to the law, the court selected a sentence of 250 months. From an appellate perspective, we are entitled to treat

this sentence as presumptively reasonable. *Rita v. United States*, 127 S.Ct. 2456 (2007). Nothing in this record makes us think either that the district court misunderstood its own broad discretion, or that the sentence it selected was an unreasonable one.

The judgment of the district court is AFFIRMED.