In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1470 & 08-1493

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CORVET T. WILLIAMS and BRIAN AUSTIN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 06 CR 50055—**Philip G. Reinhard**, *Judge.*

ARGUED NOVEMBER 4, 2008—DECIDED AUGUST 4, 2009

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* On the Wednesday before their Monday morning trial for two armed bank robberies, defendants Corvet Williams and Brian Austin learned of a new witness for the government. The witness, Edward Walker, claimed to be the get-away driver for the second robbery. In exchange for immunity from prosecution, Walker agreed to describe the second robbery, identify Williams and Austin as the robbers, and testify that

Austin admitted to committing the first robbery. The defendants requested a continuance to respond to Walker's testimony, but the district court denied the motion. The trial proceeded, Walker testified, and the jury convicted Williams and Austin of two counts of armed bank robbery under 18 U.S.C. §§ 2113(a), (d) and two counts of using a firearm during the commission of a crime of violence under 18 U.S.C. § 924(c)(1)(A). Williams was sentenced to 646 months; Austin received 648 months.

The defendants challenge the district court's denial of the continuance. They argue that its ruling was an abuse of discretion and violated their Sixth and Fourteenth Amendment rights. The defendants also argue that the admission of certain expert testimony violated FED. R. EVID. 702. While we find the evidentiary error harmless, we agree that the district court abused its discretion by denying the continuance. We therefore reverse the convictions and remand for a new trial.

## I

Rockford, Illinois, was the scene of two robberies in the early fall of 2006. Two armed men in ski masks hit the Alpine Bank branch in a Logli's supermarket on August 23rd, stealing over $12,000, and two armed men in ski masks robbed the Associated Bank on September 5th, stealing over $13,000. Williams and Austin were indicted for the two robberies in December 2006; later, the trial date was set for Monday, October 22, 2007.

After receiving a subpoena from the government on September 21, 2007, Walker contacted the U.S. Attorney's Office about his testimony. He was interviewed on October 11th, eleven days before trial, and he received an immunity letter on October 16th. In addition to giving him immunity, the government promised to make Walker's cooperation known to a state-court judge handling an unrelated pending charge against Walker. On October 17th, the morning of the final pre-trial conference, the government informed Williams and Austin that it had granted Walker immunity in exchange for his testimony, and it gave them a report of Walker's interview and a copy of the immunity letter.

The only document mentioning Walker disclosed prior to October 17th was a police report describing Walker's arrest the day after the second robbery for an unrelated charge. That report indicates that Walker refused to answer any questions about the robbery and invoked his Fifth Amendment rights. The government also notes that Williams and Austin were acquainted with Walker.

At the trial, Walker testified that he was the get-away driver for the September 5th robbery. He also identified Williams and Austin as the two men who entered the bank and recounted Austin's admission that he was also one of the robbers on August 23rd. Walker described the execution of the robbery in some detail. According to his account, on September 5th Walker met Williams and Austin early in the morning, at about 7:30 a.m. and 8 a.m. respectively. The three men remained together until the robbery at 10:40 a.m.; during that time, they

drove around the robbery site in a red Ford 500 that Walker's mother had rented and hot-wired a station wagon and a blue car. Walker then parked the red Ford on Vassar Street and drove the blue car to a street behind the bank to wait as Williams and Austin drove the station wagon to the bank. After robbing the bank, Williams and Austin got into the blue car with Walker, at which point Walker drove to Vassar Street, where the three men switched to the red Ford. They then drove to the home of Austin's girlfriend, Chianta Jefferson; at Jefferson's house they divided the money in thirds, taking about $5,000 each. Walker also testified that he provided masks, gloves, and a .45 caliber handgun for the robbery.

Walker's testimony was not the only new information revealed in the days before trial. On Friday, October 19th, the government disclosed that it had released Don Catalina from his subpoena. Catalina was a witness who was going to testify that he saw only two men in the red Ford on Vassar Street. While formerly a prosecution witness, Catalina contradicted Walker's account of three men in the red Ford. On Saturday, October 20th, the defendants learned that Walker had also provided new physical evidence: a 9 mm gun he claimed was used during the robbery and later stored by his friend. Not until Walker's testimony at trial did the defendants learn that the friend was Walker's girlfriend, Dolanda. Additionally (and unrelated to Walker), the government disclosed on October 17th an FBI report summarizing an interview with Oscar Taylor. Though Taylor never testified, the report suggested that Taylor would corrobo-

rate the testimony of another inmate regarding incriminating statements by Austin in jail.

The defendants requested a continuance to investigate Walker and Taylor, to consider the impact of their testimony, and to procure Catalina's testimony. At the October 17th hearing, both Williams's counsel, Paul Flynn, and Austin's counsel, Robert Fagan, notified the district court of the new information and the need for a continuance. Fagan also informed the district court that he had depositions scheduled Thursday and Friday and would be unable to attend a hearing or file a written motion until the weekend. The district court informed Fagan that it would read a motion on Sunday, and Fagan accordingly electronically filed a motion for a continuance Sunday morning. Williams joined that motion.

After listening to arguments Monday morning before trial, the district court denied the request for a continuance. The court found that any prejudice from the release of Catalina was cured by the government's offer to stipulate to the content of Catalina's testimony. It faulted the defendants for not taking Catalina's deposition after learning of his release from the subpoena. The judge decided that five days was sufficient time to prepare for Taylor's possible testimony.

As for Walker, the district court acknowledged that his late addition was disturbing, but it reasoned that the defendants were aware of Walker's possible involvement from the police report and from their friendship with Walker. The court again deemed five days sufficient time to prepare for Walker's testimony, but, as

an additional precaution, it ordered the government not to mention Walker in its opening statement.

## II

This court reverses a district court's denial of a continuance only if there was an abuse of discretion and a showing of actual prejudice. *United States v. Price*, 520 F.3d 753, 759-60 (7th Cir. 2008) (citing *United States v. Miller*, 327 F.3d 598, 601 (7th Cir. 2003)). In addition to arguing that the district court abused its discretion, the defendants raise two constitutional claims. Because we find that the district court abused its discretion by denying the continuance, we need not reach those arguments.

We have previously proposed a non-exhaustive list of factors that a district court should consider when ruling on a motion for a continuance:

> 1) the amount of time available for preparation; 2) the likelihood of prejudice from denial of the continuance; 3) the defendant's role in shortening the effective preparation time; 4) the degree of complexity of the case; 5) the availability of discovery from the prosecution; 6) the likelihood a continuance would have satisfied the movant's needs; and 7) the inconvenience and burden to the district court and its pending case load.

*Miller*, 327 F.3d at 601.

The defendants first challenge the district court's procedure by arguing that the district court abused its discre-

tion by not mentioning these seven factors. This point is not well taken. While a court should take these factors into account, *Miller* does not require a rigid recitation and analysis of each point before a continuance may be denied. The list in *Miller* is merely designed to highlight the most common issues that the district court should evaluate. The importance of any one factor depends on the individual circumstances of the case.

The defendants' substantive argument is more persuasive. They argue that the district court abused its discretion because, despite compelling reasons to grant a continuance, the court denied the request on the assumption that Walker was not, in fact, a surprise witness. The court made no mention of any inconvenience that a brief continuance might have imposed.

The main reasons counsel gave for seeking a continuance were Walker's likely effect on the trial and the short time available for preparation. The government asserts that Walker's testimony played a minor role and simply corroborated the other evidence, but Walker's insider account of the crime belies this characterization. Walker not only identified Austin and Williams as the September 5th robbers; he also described the preparation and execution of the robbery and testified about Austin's admission that he committed the August 23rd robbery. Walker's testimony transformed the government's case from a crime involving two men to a crime involving three men. This last-minute switch created new contradictions in the evidence and provided an alternative defense strategy—the argument that only two men com-

mitted the robbery and that one of the men was Walker. There is substantial evidence to support this alternative theory. All three of the government's original eyewitnesses to the September 5th robbery saw two men; a man saw two men in the bank, a woman saw two men running from a blue car to a red Ford on Vassar Street, and Catalina saw two men in a red Ford on Vassar Street. Additionally, while Walker testified that he was with Williams and Austin for three hours before the robbery, cell phone records show that during that time Williams and Austin used their phones from different locations to talk to each other.

Given the impact of Walker's testimony, the supposition that the defense could prepare a response in just four days is unrealistic. The defendants learned of Walker's testimony the Wednesday before a Monday morning trial; they therefore had only one half-day, two weekdays, and two weekend days to prepare (at the same time as they were engaged in the remainder of their anticipated trial preparation). The government also counts the two days of trial before Walker testified (noting that the district court prevented the government from mentioning Walker during the opening statement), but that, too, is unrealistic. The defense needed to investigate Walker, evaluate the new evidence, and adapt its strategy. To expect meaningful investigation by attorneys during trial misunderstands both the reality of trial and defense attorneys' resources. It also ignores the fact that the defense naturally wanted to develop a consistent theory for the trial. Walker's testimony tied together the evidence, detailed the commission of the

robbery, created contradictions in the evidence, and opened the door to a new defense theory. Two business days and two weekend days were not enough.

The defendants had even less time to respond to other pieces of information. They had one weekend day to react to the news that Walker had given the FBI the 9 mm gun allegedly used during the robbery. They had no time before trial to investigate Dolanda, the woman who stored the gun; her name, contact information, and relationship to Walker came out during the trial. The district court faulted the defendants for not obtaining Catalina's deposition, but Catalina's testimony that two men, not three, were involved actually helped the defense after the addition of Walker. The defendants learned about Catalina's release from the subpoena on the Friday before trial. Two weekend days is insufficient time to arrange for a deposition. The government asserts that the stipulation adequately substituted for Catalina's live testimony, but we agree with the defendants that the number of men in the red Ford was an important dispute and that live testimony is more persuasive than a stipulation. While Catalina's release by itself was probably not enough to justify a continuance, it adds yet another reason to a compelling list.

The typical reasons to deny a continuance are that the defendant shortened her own preparation time and that a delay will burden the court. Neither reason exists here. The government at first concedes that the defendants did not shorten their preparation time, but it later asserts that the defendants should have prepared

for the possibility of Walker's testimony. The government reasons that the defendants knew about Walker because they committed the robbery with him, but this argument assumes the answer to the central question—who did commit these robberies? The government next points to the police report describing the police's attempt to interview Walker about the robbery, but this report also says that Walker refused to answer any questions. The defendants reasonably believed that Walker would refuse to talk with them as he had refused to talk to the police, a belief borne out by Walker's refusal to speak with defendants' counsel after the immunity deal. During the year leading up to the trial, the defendants had no reason to expect that the government, which apparently had ignored Walker, would offer Walker immunity a week before trial. Unlike the government, the defendants had nothing to offer Walker for his cooperation. They reasonably chose not to allocate their limited resources to investigating Walker. It was the government that failed to follow up with Walker, and therefore the government, not the defendants, is responsible for the timing of Walker's cooperation.

Furthermore, this is not a case in which the defendants tried to delay the trial unnecessarily or had a history of "gaming" the system. As in *Carlson v. Jess*, 526 F.3d 1018 (7th Cir. 2008), in which this court found an abuse of discretion for denying a continuance, these defendants remained in jail before trial and would have remained in jail throughout any continuance. It is also worth noting that this motion for a continuance was the defendants' first.

This case also contains no evidence that delaying the trial would have inconvenienced or burdened the court. The district court never consulted its calendar to look for an alternative trial date and it never asked the defendants how much time they wanted. As we noted in *Carlson*, the failure to inquire how long the defense needs to prepare suggests that the district court unreasonably considered any delay unacceptable: "That sort of rigidity can only be characterized as arbitrary." 526 F.3d at 1026.

Because the record shows no reason to deny a continuance, and several compelling reasons to grant one, we find that the district court abused its discretion by denying the continuance. The question therefore becomes whether the defendants showed that they suffer actual prejudice from the denial.

To show prejudice, the defendants list several steps they would have taken with more time: (1) obtain Walker's cell phone records for September 5th and August 23rd; (2) interview Walker's brother, who helped switch the get-away cars; (3) interview Walker's sister, who Walker visited on September 5th; (4) interview Walker's mother, in whose name the red Ford 500 was rented; (5) interview Walker's girlfriend Dolanda about the 9 mm gun; (6) discover if Walker is left-handed, as the taller robber (allegedly the right-handed Williams) held his gun in his left hand; (7) subpoena Catalina; (8) test and attempt to trace the 9 mm gun; (9) test the second set of DNA on Williams's glove to see if it matched with Walker; (10) search for a witness to identify Walker on

the robbery video; (11) obtain Walker's bank records and investigate Walker's spending habits to see if he had money after August 23rd or more than $5,000 after September 5th.

The government argues that this is all so much speculation. For support the government cites *United States v. Price*, 520 F.3d 753 (7th Cir. 2008), and *Bell v. Duckworth*, 861 F.2d 169 (7th Cir. 1988), but the comparison to those cases is unconvincing. *Price* found the prejudice speculative because the defendant wanted more time to gather information to impeach a police officer who was not involved in the relevant arrest, search, or collection of evidence. *Price*, 520 F.3d at 759. *Bell* faulted the defendant for not suggesting what defense he might have developed with more time. *Bell*, 861 F.2d at 170. Here, the defendants suggested an alternative defense (blaming Walker) and proposed significant and concrete avenues of investigation. The defendants therefore suffered actual prejudice from the denial of their motion for a continuance. Contrary to the government's argument, we do not require a defendant to produce actual new evidence to show prejudice. Not only would such a rule expect defendants to know the results of investigations they were not given time to conduct, it would overload the resources of criminal defendants and their attorneys and strain the rules of appellate procedure by requiring defendants to supplement the record.

**III**

The defendants also complain on appeal about the district court's decision to admit Susan Wilson's expert testimony. Wilson, a forensic scientist, testified that an impression on a glass door at the September 5th robbery scene was left by a non-woven fabric and could have been made by a glove. Wilson also sought to testify that the impression was consistent with the pair of gloves containing Williams's DNA, but the district court excluded that testimony because it considered the underlying science, fabric impression analysis, unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Both parties agree that Wilson's testimony constitutes expert testimony under FED. R. EVID. 702. Under that rule, the testimony must be "the product of reliable principles and methods." The defendants argue that the admitted testimony relied on the same science as the excluded testimony—fabric impression analysis—and therefore also should have been excluded.

Even if we agreed with the defendants or thought that this was junk science, we consider any error to be harmless. A video of the September 5th robbery shows both robbers wearing gloves, and so testimony that a glove impression is on a door at the scene adds little to the case. Given the other evidence, admitting Wilson's testimony was harmless error.

\* \* \*

Because we find that the district court abused its discretion by denying the request for a continuance, we

REVERSE Williams's and Austin's convictions and
REMAND for a new trial.