In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-2522

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TRACIE DICKEY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-CR-00475 — **Sara L. Ellis**, *Judge.*

_____

ARGUED SEPTEMBER 8, 2022 — DECIDED OCTOBER 28, 2022

_____

Before WOOD, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Tracie Dickey built a following as the leader of her own church, Deliverance Tabernacle Ministries International. She claimed to be a prophet who received commands from God. Her worshipers (in reality, victims) had to live in church space and work several jobs. All money earned went to Dickey, who used the funds to pay for personal

expenses. She used physical and mental coercion to ensure compliance with her demands.

Having been convicted of one count of wire fraud, 18 U.S.C. § 1343, and one count of forced labor, 18 U.S.C. § 1589, for her actions, Dickey timely filed this appeal. She challenges three of the district court's rulings: the denial of her fourth motion to continue her trial, the rejection of a proposed jury instruction regarding religious liberty, and the imposition of restitution ordering her to pay for future mental health treatment for her victims. We now affirm.

## I. Background

### A. Deliverance Tabernacle Ministries

As early as 2009, Tracey Dickey recruited followers for her church, Deliverance Tabernacle Ministries International ("DTM"). As four former congregants explained, Dickey's recruitment followed a pattern: through her proselytizing, Dickey groomed vulnerable victims and forced them to disavow their families, live in the church, and work multiple full-time jobs. The victims would then give Dickey all their wages, which she would keep for herself. She required multiple victims to find employment at Hyatt hotels, where Dickey forced them to falsify reservation bookings, thereby fraudulently misdirecting kickbacks to Dickey's own travel company. If someone disobeyed, Dickey threatened them with violence and required them to be homeless until she considered them redeemed. All told, her scheme netted $1.5 million, most of which came from DTM members. She spent over $1 million on personal expenses, such as travel, rental and vacation properties, and luxury hotels.

On July 26, 2016, the government indicted Dickey on three counts of wire fraud and one count of obtaining forced labor, though the government later dropped two of the wire fraud charges. Count One charged Dickey with wire fraud as part of the Hyatt hotels kickback scheme. Count Four charged Dickey with obtaining forced labor of a victim by threatening her with serious harm and physical restraint to force her to participate in the scheme.

**B. Procedural History**

During the pretrial proceedings, Dickey's relationship with her attorneys was tumultuous. In total, she changed defense counsel six times and the court granted her three continuances.

Dickey was on her third attorney when the district court scheduled her first trial date for April 23, 2018. This date gave the defense almost a full year to prepare. But two months before the trial, Dickey filed a motion for new counsel; she wanted to hire two attorneys, one of whom assured the district court that the team would be trial-ready in April. With the caveat that the trial would not be continued because of the change, the court granted the motion to retain counsel.

Only a few weeks later, Dickey's new counsel moved to withdraw and the court reappointed her prior counsel. The district court continued the trial, over the government's objection, to September 4, 2018, rearranging its schedule to accommodate Dickey. The district court warned Dickey, however, that the new trial date was firm and it would not grant another continuance.

But still, less than a month before the trial began, Dickey's most recent attorney asked for another continuance. She said

that Dickey had recently informed her of witnesses warranting further investigation. The district court was skeptical, noting that Dickey had known about these witnesses all along and had clearly waited until the eleventh hour to inform her attorney about them. It also emphasized the emotional burden another continuance placed on the testifying victims. Nonetheless, the court continued the trial a second time to October 9, 2018.

After only another week, Dickey's counsel sought to withdraw because Dickey had filed an ethics complaint against her. The court appointed standby counsel, but shortly thereafter, Dickey retained a new attorney, Victor Henderson, who filed an appearance and moved for another continuance. Despite the earlier warnings, the district court granted Henderson's motion to continue the trial and set the trial date for February 4, 2019, giving the defense about four months to prepare. The court warned Henderson in no uncertain terms that if this was not enough time, he should not take Dickey's case, because the court would not be moving the trial a fourth time. In the face of this warning, Henderson agreed to represent Dickey and the case moved forward.

Henderson tried to continue the trial twice more, but the district court stood firm on the February date. The judge reminded Henderson that he had taken on the case with the explicit warning that the February trial date would not move; the court explained that it had arranged other criminal trials around Dickey's; and at any rate, it noted that the testimony of the expert whom Dickey wanted a continuance to hire would not be admissible at trial. Dickey wanted to present expert testimony on whether the victims "voluntarily subjected themselves" to poor treatment. But the judge reasoned that

whether the victims acted voluntarily was a fact question for the jury, not one for an expert to decide. The trial went forward on February 4, 2019, as scheduled, with Henderson as Dickey's counsel.

### C. Trial and Sentencing

Four victims and former DTM congregants—A.A., S.W., L.H., and K.H.—testified at trial. In addition, several Hyatt employees and two FBI investigators testified about the fraud scheme. Dickey called four witnesses, current DTM members, who explained that they joined the church freely and could leave at any time. They claimed to have given money to Dickey willingly and without reservation.

Prior to deliberations, the district court instructed the jury about the elements of wire fraud and forced labor. Dickey requested, and the district court permitted, an instruction that the jury should not be influenced "by any person's religion" in deciding the case. Dickey requested an additional instruction:

> You should not consider the ways in which the Defendant exercised or practiced her religion in determining whether she is guilty of these charges. All individuals have a right to the free exercise of religion.

The district court declined to give this instruction. Dickey was allowed to make the argument in closing, but the district court explained that Dickey's proposed instruction risked confusing the jury by suggesting that religion can act as a "shield or … trump[] the statute, which it does not." In closing, the government argued that the jury should not let Dickey "hide behind her religion … [or] the concept of free will that she full well knows that she undermined with years

and years of abuse." Defense counsel argued the opposite, that each purported victim had acted of her own volition in furtherance of her religious beliefs. "That's what's great about America," he explained, "[y]ou can go to whatever kind of church you want to, or you don't have to go at all. But it's your choice …. If you don't like your church, you leave." The jury convicted Dickey on both counts.

At the sentencing hearing, Dickey expressed little remorse. Rather, she explained that her "words, actions, or intentions were incorrectly perceived or misconstrued by others." A.A., S.W., L.H., and K.H. again testified at the hearing about their harrowing experiences with Dickey. S.W. equated her decade at DTM to "psychological bondage" that afflicted her with anxiety and paranoia. As a result, she suffers from panic attacks, thoughts of suicide, and the constant feeling of being burdened by her past. A.A. compared DTM to "Heaven's Gate," a cult that led its members to mass suicide, and Dickey to Jim Jones, another infamous cult leader. K.H. described her own "psychological scars," and L.H. recounted how her knees became permanently damaged from the miles she had to walk after Dickey took her car as punishment. The district court sentenced Dickey to 144 months' imprisonment on each count to run concurrently and three years' supervised release.

The court also held a special hearing to consider restitution. The government presented the testimony and expert report of Dr. Diana Goldstein, a clinical neuropsychologist with expertise in trauma-related disorders. Dr. Goldstein described the causes and symptoms of stress disorders like complex PTSD. She then noted, based on a victim impact summary provided by the government, aspects of the victims' pathologies that aligned with trauma and stress disorders. Dr.

Goldstein also provided a letter with a range of treatment costs associated with complex PTSD, which supported the government's estimate of therapy costs at $12,714 per victim. The district court ordered Dickey to pay restitution in the amount of $1.14 million, including the figure of $12,714 for the cost of each victim's future mental health treatment.

## II. Analysis

Dickey filed this appeal to challenge her conviction and sentence. She argues that the district court erred when it refused to continue her trial for a fourth time, when it denied her proposed jury instruction on religious liberty, and when it ordered restitution based on Dr. Goldstein's testimony.

### A. Motion to Continue Trial Date

We begin with the district court's denial of Dickey's fourth motion to continue her trial date. We review the denial of a continuance for abuse of discretion and a showing of prejudice. *United States v. Miller*, 327 F.3d 598, 601 (7th Cir. 2003).

In deciding whether to grant a continuance, courts should consider: (1) the amount of time available for preparation; (2) the likelihood of prejudice from denial of the continuance; (3) the defendant's role in shortening the effective preparation time; (4) the degree of complexity of the case; (5) the availability of discovery from the prosecution; (6) the likelihood a continuance would have satisfied the movant's needs; and (7) the public interest, including fairness and harm to victims and inconvenience to the district court in light of its pending case load. *See, e.g., United States v. Cosby*, 924 F.3d 329, 334–35 (7th Cir. 2019); *United States v. Shields*, 789 F.3d 733, 748 (7th Cir. 2015); *United States v. Volpentesta*, 727 F.3d 666, 678–79 (7th Cir. 2013); *United States v. Isaacs*, 593 F.3d 517, 525 (7th Cir.

2010). At the same time, "[w]hile a court should take these factors into account," our law does not mandate "a rigid recitation and analysis of each point before a continuance may be denied." *United States v. Williams*, 576 F.3d 385, 389 (7th Cir. 2009). These factors "highlight the most common issues that the district court should evaluate. The importance of any one factor depends on the individual circumstances of the case." *Id*.

In denying Dickey's fourth motion for a continuance, the district court noted many factors against continuing the trial another time. The court cited the case's "significant history," a clear reference to Dickey's two-and-a-half years of preparation for trial; noted Dickey's own role in prolonging the trial process by turning away multiple "excellent" lawyers who "did an amazing job … representing Ms. Dickey;" emphasized the repeated impact of rescheduling trial on vulnerable victims who had to relive their trauma each time they prepared; made it abundantly clear that its caseload demands were strenuous and that it had trials scheduled around Dickey's; and pointed to the court's own reliance on Victor Henderson, Dickey's final attorney, who took on her case with the explicit understanding that he would have four months to prepare. The district court did not abuse its discretion in conducting this meticulous consideration of the relevant factors.

Nor was there any prejudice to Dickey. She claims that more time was needed to retain experts, review discovery, understand the facts of the case, cross-examine the witnesses, and develop a "coherent" theory of the case. But defense counsel *did* retain an expert, met with the defendant, developed a cogent theory, cross-examined witnesses, presented witnesses who expressed "willful devotion," and made a

forceful closing argument. Further, defense counsel represented to the court that he had reviewed all of the discovery in the case and had gone over it with Dickey. The court properly exercised its discretion in denying the motion for a fourth continuance.

## B. Religious Liberty Jury Instruction

We review de novo a district court's "refusal to provide a requested jury instruction when the underlying assignment of error implicates a question of law, but general attacks on the jury instructions are reviewed for an abuse of discretion." *United States v. Bonin*, 932 F.3d 523, 539 (7th Cir. 2019) (quoting *United States v. Bloom*, 846 F.3d 243, 255 (7th Cir. 2017)).

"A defendant is entitled to an instruction on [her] theory of defense if: (1) the instruction is a correct statement of the law; (2) the evidence supports the theory of defense; (3) the defense is not part of the government's charge; and (4) the failure to give the instruction would deprive the defendant of a fair trial." *United States v. Brown*, 865 F.3d 566, 571 (7th Cir. 2017).

Dickey wanted the jury instructed as follows:

> You should not consider the ways in which the Defendant exercised or practiced her religion in determining whether she is guilty of these charges. All individuals have a right to the free exercise of religion.

Her proposed jury instruction failed at the outset because it is not an accurate statement of the law. Dickey's proposed instruction would have excused her criminal conduct based on her religious assertions. That broad interpretation finds no support in the caselaw. To the contrary, neutral laws of general applicability are consistent with the First Amendment.

*See United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000). Neither count at issue violates this principle.

The district court properly instructed the jury on the ele-ments of each count, which enabled Dickey to argue that her victims voluntarily undertook their actions. The court also gave Dickey's proposed instruction that the jury should not be influenced "by any person's religion" in deciding the case. Further, the district court gave Dickey significant latitude to argue—and, indeed, she did argue—that her victims joined the church willingly, could leave at any time, and generally exercised their freedom of religion. Dickey's counsel made this point in closing argument: "[I]t's your choice …. If you don't like your church, you leave." The district court properly rejected Dickey's instruction.

## C. Restitution Calculation

We turn finally to the calculation of restitution for the four victims who testified at Dickey's trial. "'We review de novo questions of law regarding the federal courts' authority to or-der restitution,' and 'we review for abuse of discretion a dis-trict court's calculation of restitution, taking the evidence in the light most favorable to the [g]overnment.'" *United States v. Alverez*, 21 F.4th 499, 502–03 (7th Cir. 2021) (quoting *United States v. Webber*, 536 F.3d 584, 601 (7th Cir. 2008) (citations omitted)). Because this is a challenge to the calculation of res-titution, we review for abuse of discretion.

Dickey acknowledges that a restitution order can include payments to victims of the offense for the projected cost of fu-ture mental health treatment. *See United States v. Protho*, 41 F.4th 812, 832 (7th Cir. 2022) ("A district court's restitution or-der may require the defendant to pay any victim harmed by

the defendant's offense the cost of necessary medical and re-
lated professional services for psychiatric and psychological
care." (citing 18 U.S.C §§ 3663, 3663A)); *United States v. Danser*,
270 F.3d 451, 455 (7th Cir. 2001) ("In light of Congress's intent
to make whole those victims of sexual exploitation, we find
that section 2259 allows for restitutionary damages for the fu-
ture costs of therapy.").* She objects only to the method by
which the district court calculated the damages for each vic-
tim in her case.

The district court has "broad discretion to determine the
procedures for calculating the amount of restitution." *United
States v. Robl*, 8 F.4th 515, 527 (7th Cir. 2021) (quoting *United
States v. Hassebrock*, 663 F.3d 906, 925 (7th Cir. 2011)). The gov-
ernment need only establish the amount by a preponderance
of the evidence—enough "that the fact-finder believe[s] that
the existence of a fact is more probable than its non-

---

* In *Protho* and *Danser*, this Court held that future costs of victims'
mental health treatment could properly be included in restitution under
two separate statutes. In *Danser*, this Court reached that conclusion be-
cause restitution covered the "full amount of the victim's losses" under 18
U.S.C. § 2259(c)(2), which the Court found to include future mental health
treatment expenses. 270 F.3d at 455. Similarly, in *Protho*, this Court found
that future costs of mental health treatment fell within restitution defined
as "the amount of the loss sustained by each victim as a result of the of-
fense" within the meaning of 18 U.S.C. § 3663(a)(1)(B)(i)(I). 41 F.4th at 832.
Because 18 U.S.C. § 1593(a), (b)(1)—the statute that requires restitution for
victims of forced labor, like the women who testified against Dickey—uses
the same "full amount of the victim's losses" language as in *Danser*, and
indeed defines this restitution calculation with reference to 18 U.S.C.
§ 2259(c)(2), it is clear that the reasoning in *Protho* and *Danser* controls.
Here, as in those cases, restitution properly includes both costs for mental
and physical injuries already incurred and projected costs for anticipated
mental health treatment.

existence." *Id.* (quoting *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013)). Although awards of prospective losses often have "inherent uncertainties," those uncertainties do not mean they are wrong. *Danser*, 270 F.3d at 455 n.5.

Here, the district court did not abuse its discretion in calculating the cost of future mental health treatment. The government presented the expert testimony of Dr. Diana Goldstein, a clinical neuropsychologist with expertise in trauma-related disorders. Dr. Goldstein based her opinions on her experience and a position paper from the International Society of Traumatic Stress and the DSM-5. Additionally, she reviewed a summary of the facts of the case. She estimated that treatment for complex PTSD would require multiple early treatment interventions, various psychological therapies, and pharmacological options. And although her estimate was based on treatment for complex PTSD, Dr. Goldstein did not apply a one-size-fits-all approach to mental health treatment. Rather, she explicitly considered in her estimate the closely related psychological conditions that often need to be treated alongside complex PTSD and which could impact and inform treatment of the victims in this case.

Admittedly, Dr. Goldstein reached these conclusions based on the limited information supplied by the government, which led her to consider the victims as a group, rather than individually. But her collective analysis makes sense in a case like this one, where the victims received similar physical and psychological treatment by Dickey and experienced comparable symptoms after the abuse. And the record on which the district court made its ultimate decision was even richer—not only did the judge hear the expert testimony about complex PTSD and associated disorders, but she heard

the extensive trial testimony of the individual victims about their own symptoms and experiences (including two who were diagnosed with PTSD), had the benefit of the victim-impact statements, and held a hearing solely for the restitution issue.

After the hearing, the district court carefully reviewed this evidence and found that restitution on the low end of Dr. Goldstein's recommended complex PTSD treatment costs was appropriate for each testifying victim. The district court did not abuse its discretion.

### III. Conclusion

Because the district court's patient and thorough decision-making at each step cannot be considered an abuse of discretion, we

AFFIRM.