In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2899

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SCOTT CARLBERG,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cr-00232-1 — **Edmond Chang**, *Judge.*

ARGUED MAY 16, 2024 — DECIDED JULY 23, 2024

Before EASTERBROOK, RIPPLE, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* A jury convicted Scott Carlberg of four counts of wire fraud for fraudulently obtaining disability benefits from the United States Railroad Retirement Board. Carlberg asked the district judge to set aside the jury's verdict because he believed the evidence did not show he intentionally participated in a scheme to defraud or made

representations that were material to the agency's decision to grant him disability benefits. The judge denied Carlberg's motion and ordered him to pay $279,655.22 in restitution—the full value of benefits he received during the six-year period alleged in the indictment. Carlberg maintains both decisions were wrong. We disagree and affirm.

## I

## A

Scott Carlberg began working at Soo Line Railroad in 1990. His work was cut short in October 2012, when he suffered a traumatic brain injury from exposure to electricity at the railroad. The injury prevented him from continuing to work at the railroad, so Carlberg filed an application for occupational disability with the United States Railroad Retirement Board ("RRB") in May 2013. Based in Chicago, Illinois, the RRB is a federal agency that administers retirement, unemployment, and disability benefits for current and former railroad employees.

To be eligible for an occupational disability annuity from the RRB, an individual must have a "permanent" disability that prevents them from working in their regular railroad occupation. But the RRB does not require prospective annuitants to cease all work. To the contrary, the agency allows annuitants to work other, non-railroad jobs and still receive benefits, so long as that job does not require a high level of physical or mental exertion and the annuitant falls under certain earnings thresholds each month.

Once the RRB awards occupational disability benefits, regulations mandate that annuitants periodically disclose their non-railroad related work and earnings to the agency. This

mandate is made clear to applicants from the moment they apply for benefits. The application includes a certification requiring applicants to "immediately" notify the RRB "if I work for any employer, railroad or nonrailroad, or perform any self-employment work." The certification also provides: "I know that if I am receiving a disability annuity and fail to report work and earnings promptly, I am committing a crime punishable by Federal law that may result in criminal prosecution and/or penalty deductions in my annuity payments." Carlberg signed this certification when he applied for a disability annuity in May 2013.

Carlberg signed the certification again in February 2015, when he reapplied to the RRB for occupational disability "with a freeze." Occupational disability with a freeze differs from the benefits Carlberg was already receiving because a "freeze" entitles an annuitant to early Medicare, tax benefits, and higher monthly payments. But to receive those additional benefits, the applicant must clear a higher bar: an applicant "must have a permanent medical condition that prevents [them] from performing *any* substantive gainful work"—not just work on the railroad. Under RRB regulations, substantive gainful work (sometimes called "substantial gainful activity") includes any work "involving the performance of significant physical or mental duties."

As with the regular occupational disability application, the application for occupational disability with a freeze requires annuitants to make certain attestations. Namely, they must attest that "if I make a false or fraudulent statement in order to receive benefits from the RRB or if I fail to disclose earnings or report employment of any kind to the RRB, I am committing a crime which is punishable under Federal law."

They must also certify that "the information I gave to the RRB on this application is true to the best of my knowledge. I agree to immediately notify the RRB: If I work for any employer, railroad or nonrailroad, or perform any self-employment work." As before, Carlberg signed this certification. The RRB approved Carlberg's application for occupational disability benefits with a freeze in June 2015.

**B**

That last application for benefits, in February 2015, gave rise to Carlberg's prosecution. In April 2021, the government charged Carlberg with four counts of wire fraud for lying on his application for disability with a freeze and in subsequent submissions to the RRB. The government alleged that while Carlberg was completing his application for disability benefits with a freeze, he was also negotiating to purchase the Parrot Bay Tanning Salon in Menomonie, Wisconsin. But the problem was not that he purchased the salon; RRB regulations did not bar that. The problem, according to the government, was that Carlberg "operated and managed the Salon and its employees" all while misleading the RRB about the substance of his work there.

And when the RRB asked him to provide additional information about whether he was self-employed and the nature of his work, he handwrote on his application that he had "no work" and "no business." In a subsequent report to the RRB in July 2015 and a call in April 2016, Carlberg represented that he was doing "small job[s]" like "blow[ing] off [the] driveway, water[ing] flower[s], and clean[ing] tanning beds" for 10-20 hours per week. The government alleges that these statements were false and caused the United States Treasury to wire Carlberg disability benefits that he would not have

been entitled to had he submitted accurate information to the RRB.

Carlberg contested the charges at trial. During five days in January 2023, the government presented evidence showing that, after purchasing the salon, Carlberg worked there daily. His work included installing the security camera wiring, dealing with customers, and handling physical tasks throughout the day. He also used his personal credit cards to buy supplies for the salon. He did not report any of this work to the RRB.

The government called several witnesses to make these points. It called analysts from the RRB, who explained the certifications annuitants make when applying for occupational disability benefits and how the RRB evaluates applications. It called a forensic accountant from the FBI to explain Carlberg's financial statements and how he used revenues from the salon to pay down his personal credit cards. It called Carlberg's family members, salon employees, and owners of neighboring businesses to talk about their observations of Carlberg's work at the salon and how he consistently switched out various family members as nominal "owners" of the salon to hide his ownership. The government also presented audio and video from the undercover officers who worked the investigation.

Carlberg called witnesses, too. His brother, Kevin, testified about their upbringing and Carlberg's relatively normal life before being electrocuted at the railroad. His daughter, Kaitlyn, testified about the family's conversations leading up to the purchase of the salon, and how her mother was the one "in charge" of the business. She explained that the tasks her father completed at the salon were "pretty easy to do," like checking in clients, cleaning the beds, running errands, and

ordering supplies. The bulk of Carlberg's defense was supported by the testimony of Dr. David Lund, a clinical psychologist who treated Carlberg for a cognitive disorder related to his electrocution. Dr. Lund testified that Carlberg's condition left him unable to be gainfully employed, and, in his view, Carlberg could work a retail job but not manage one.

After considering this evidence, the jury convicted Carlberg on all counts. Shortly thereafter, Carlberg moved for a judgment of acquittal, arguing that the government failed to prove that he "knowingly devised or participated in a scheme to defraud and that the scheme to defraud involved a materially false or fraudulent representation." He argued that "[w]hile [he] did receive payment from the tanning salon," the total amount of those payments "did not even match the purchase price of the salon and barely surpassed legitimate tanning salon expense reimbursements." Finally, he argued that the government failed to meet its burden because it "did not offer any evidence that the differences between the work he actually did at the tanning salon and what he disclosed to the RRB were material to any decision made by the RRB."

The district court denied Carlberg's motion. The court found "there was plenty of evidence to support the conclusion that Carlberg bought the business and then tried to hide his ownership and involvement." Similarly, the court found the evidence established that Carlberg's misrepresentations were material because the RRB witnesses testified that his approval for benefits was "based on Carlberg's claimed inability to work." The court sentenced Carlberg to 30 months' imprisonment and ordered restitution to the RRB in the amount of $279,655.22—the total amount of benefits Carlberg received after filing his application for disability benefits with a freeze.

On appeal, Carlberg challenges both the denial of his motion for a judgment of acquittal and the restitution award.

## II

## A

Ordinarily, we review a district court's denial of a motion for a judgment of acquittal de novo. *United States v. Polin*, 194 F.3d 863, 865–66 (7th Cir. 1999). Under that standard, we leave the jury's verdict undisturbed unless we find, after viewing the evidence in the light most favorable to the government, that "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *See United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 841 (2023).

But this case is a little different because the argument Carlberg advances on appeal was not presented to or considered by the district court. In the district court, Carlberg simply argued that "the evidence fail[ed] to establish that [he] was engaged in a scheme to defraud" and his misstatements were not material. But Carlberg, having failed to convince the district court that his misstatements to the RRB were immaterial and that he did not engage in a scheme to defraud, now tells us that the evidence at trial was insufficient to sustain his conviction because the government failed to show that he "obtained property by dint of his bad conduct." To do so, he argues the government would have had to prove that he was barred from "rightfully receiving disability benefits." And to prove that, he asserts, the government had to show he earned more than $1,090 in a month—the maximum sum the RRB permits annuitants to earn before finding that they engaged in substantial gainful activity. But, Carlberg continues, he

never even turned a profit at the salon, so the government did not prove that he earned that amount. Therefore, he concludes, the government could not meet its burden to prove that he fraudulently obtained RRB property in the form of disability benefits.

We have previously explained that "when a defendant challenges the sufficiency of the evidence by motion for judgment of acquittal and makes specific arguments in support of that motion, any arguments omitted are thereby forfeited," and our review is for plain error. *United States v. Hosseini*, 679 F.3d 544, 550 (7th Cir. 2012) (citing *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006)). Thus, the new argument Carlberg presents to us is arguably forfeited, making plain error the standard of review. It turns out, however, that, in this case, the standard of review does not change the outcome: Carlberg loses whether we review the district court's decision de novo or for plain error because there was no error to begin with.

The fatal flaw in Carlberg's argument is that he assumes there was only one way the jury could find that he engaged in substantial gainful activity—he assumes that, to convict, the jury must have found that his earned income exceeded the maximum amount permitted by RRB regulations. But the evidence at trial undermines that theory. The evidence at trial established that, under RRB regulations, an annuitant could be found to have engaged in substantial gainful activity—and therefore be ineligible for benefits—if he undertook work that "involve[d] performing significant physical or mental duties," regardless of his monthly income from that work. And the evidence at trial showed that Carlberg was engaged in just that type of work.

For example, at the same time Carlberg was applying for RRB benefits in early 2015, he was also negotiating with the owner of the Parrot Bay Tanning Salon to purchase the property. And witnesses testified that after he purchased it, they would often find him working there, including negotiating with various companies to procure new security systems (which Carlberg installed himself), tanning beds, and other tanning supplies.

The evidence showed that Carlberg's work was not limited to handling the salon's business on a high level. He was also engaged in hands-on, day-to-day work at the salon. Kristin Schenck owned an eatery down the street from Parrot Bay. She testified that she saw Carlberg at the salon almost daily from 2015 to 2020. When she saw him, he was working the front desk and engaged in physical labor like painting the building, shoveling the sidewalk, pressure washing the roof, blowing debris off the parking lot, and re-tarring the parking lot. Tammy Hollister, a former salon employee, testified that it was Carlberg who trained her when she started at the business, and who routinely ordered supplies and did maintenance for the building. Former customers testified that when they arrived at the salon, they observed Carlberg "on the roof," planting flowers, shoveling the sidewalks, and "in the plow truck plowing." And when the customers were ready to depart after receiving their tans, it was Carlberg who checked them out at the register.

Presented with this evidence, reasonable jurors could have easily concluded that Carlberg was engaged in the kind of "significant physical or mental duties" that would have precluded him from receiving benefits from the RRB had he reported the full extent of his work. Hence, we have no trouble

concluding that the evidence presented at trial was more than sufficient to support the jury's verdict.

**B**

Carlberg next argues that the district court erred in calculating the $279,655.22 restitution award because the government failed to "prove beyond a reasonable doubt that Carlberg [] earned over $1,090 in a month," the maximum amount annuitants could earn at non-railroad jobs and still qualify for occupational disability benefits. He argues that because his income did not exceed that amount, he was entitled to the $231,929 in occupational benefits payments he received during the period alleged in the indictment. By his account, the proper restitution amount should have been $47,726.22—the value of the early Medicare benefits he received.

We review a district court's "calculation of restitution for abuse of discretion, viewing the evidence in the light most favorable to the Government." *United States v. Griffin*, 76 F.4th 724, 749 (7th Cir. 2023). We will find an abuse of discretion if there is no evidence in the record on which the district court could have rationally based its decision. *Brown v. J.I. Case Co.*, 813 F.2d 848, 855 (7th Cir.), *cert. denied*, 484 U.S. 912 (1987).

Carlberg's restitution argument is derivative of his sufficiency-of-the-evidence argument and fails for the same reason: to prevail on the wire fraud charges, the government was not required to prove that he earned a certain amount of money—only that he materially misrepresented facts or omitted material facts about his work that met the RRB's definition of substantial gainful activity. Once the jury found Carlberg guilty on all counts, it became the government's burden to establish the actual or intended loss to the United States

Treasury by a preponderance of the evidence. *United States v. Dickey*, 52 F.4th 680, 687 (7th Cir. 2022).

The government met that burden by showing that its actual loss was the full extent of Carlberg's ill-gotten occupational disability benefits during the period alleged in the indictment. At sentencing, the government called Brittani Jefferson, an operations analyst and disability trainer in the RRB's Disability Benefits Division. Jefferson testified that analysts in her division examined the Inspector General's Investigation Report plus exhibits and transcripts of witness testimony from Carlberg's trial to determine whether a hypothetical individual like the one described in those documents would qualify for occupational disability benefits or a disability freeze under the RRB's regulations. She explained that such a person would not be eligible for benefits from the RRB at all because the RRB would consider that person to be engaged in substantial gainful activity.

The effect of that finding, Jefferson testified, was that no occupational disability benefits, much less with a freeze, would have been payable to Carlberg between 2015 and 2021 based on the scope and scale of his work during that period. Carlberg, for his part, offered no testimony to contradict that given by Jefferson. So, relying on this largely unchallenged testimony, the district court found that "[t]he government ha[d] satisfied its burden by a preponderance of the evidence that the loss amount would be the full amount of the benefits," so it awarded $279,655.22. Because that finding was consistent with the evidence introduced at sentencing, we cannot say the district court abused its discretion.

AFFIRMED.